IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JEFFERY W. BITTON, <br><br> Defendant. | **MEMORANDUM DECISION <br> AND ORDER** <br><br> Case No.  2:05-cr-661 CW <br><br> Judge Clark Waddoups |

## INTRODUCTION

This matter is before the court on Defendant Jeffery W. Bitton's Motion for Inquiry into Competency.  The issue of Bitton's competency was raised previously.   Bitton underwent intermittent neuropsychological testing from 2005 through 2007.  On July 1, 2008, the court found that Bitton was competent.  Purportedly, Bitton's cognitive state has continued to deteriorate since the initial testing, and his counsel has asked the court to determine again whether he is competent. For the reasons discussed below, the court concludes that Bitton is incompetent, and orders that he be placed in the custody of the Attorney General to determine if competency can be restored pursuant to 18 U.S.C. § 4241(d).

## FACTUAL BACKGROUND

**General History - Childhood**

Bitton is a 49 year-old man charged with conspiring to manufacture methamphetamine ("meth") and possessing iodine, with the knowledge or reasonable belief that it would be used to manufacture meth.  At this stage of the proceeding, Bitton's counsel does not contend that Bitton

lacks a factual understanding of the charges against him. Due to cognitive deficits, however, Bitton's counsel contends that Bitton lacks an ability to consult with counsel and aid in his own defense.

From an early age, Bitton has had cognitive deficits. In first grade, he was diagnosed with a learning disability and had to repeat that grade.[1] At some point after the first grade, Bitton suffered a head injury.[2] He fell off the top of a swing set and landed head first on a pile of cinder blocks.[3] He lost consciousness, was hospitalized overnight,[4] and had stitches across his nose and over more than half of his forehead due to the injury.[5] Bitton's mother and sister believe he "had a problem before and the head injury made it worse."[6]

After the injury, Bitton continued to struggle in school. He attended special education classes and had little social interaction with his classmates.[7] At about age ten, Bitton's verbal intelligence quotient ("IQ") was 78, nonverbal was 82, and his full-scale score was 80.[8] His parents hired a

---

[1] Second Hearing Tr., 18:8–12 (Docket No. 233).

[2] *Id.* at 18:3–7.

[3] First Hearing Tr., 174:23–175:3.

[4] Second Hearing Tr., 130:1–5; 130:11–13 (Docket No. 233).

[5] Picture of Bitton as a Child (Def. Ex. E - first hearing).

[6] Vickie R. Gregory, Neuropsychological Evaluation, 3 (Nov. 2007) (Def. Ex. C - first hearing) (hereinafter "Gregory Report I").

[7] Second Hearing Tr., 120:22–121:8 (Docket No. 233).

[8] School Records, at 2 (Def. Ex. A - first hearing).

special tutor for him as he got older, but Bitton was unable to retain the concepts being taught.[9]  His

performance was "sporadic" and he "had problems with learning and remembering words."[10]

According to Bitton's school records, Bitton's GPA was 1.433 in the seventh grade, 0.857 in the

eighth grade, and 1.027 in the ninth grade.[11]  He did particularly poorly in math, English, and

history.[12]  He did better in physical education, shop, and art for some of the years.[13]  In the ninth

grade, Bitton took a General Aptitude Test Battery ("GATB").  His verbal aptitude was in the 9th

percentile, his form perception was in the 26th percentile, his motor coordination was in the 74th

percentile, and his spatial aptitude was in the 93d percentile.[14]  His general learning aptitude,

however, was only in the 11th percentile.[15]  Bitton then dropped out of school in about the ninth

grade.[16]

**General History - Adulthood**

As an adult, Bitton performs normally on adaptive functioning tests, which are tests given

---

[9]  Second Hearing Tr., 122:3–7 (Docket No. 233).

[10]  Gregory Report I, at 3 (Def. Ex. C - first hearing).

[11]  School Records, at 1 (Def. Ex. A - first hearing).

[12]  *Id.*

[13]  *Id.*

[14]  *Id.* at 2; Gregory Report I, at 5 (Def. Ex. C - first hearing).

[15]  School Records, at 2 (Def. Ex. A - first hearing); Gregory Report I, at 5 (Def. Ex. C - first hearing).

[16]  Second Hearing Tr., 135:15–22 (Docket No. 233).

to assess mental retardation.[17]  He is fully capable of doing such tasks as bathing, dressing, and tying

his shoes.  In the past, he has driven a vehicle and has been employed.  During competency testing

in 2006, Bitton drove himself to the doctor's office, arrived on time, and returned to the office with

no difficulty after lunch.[18]  For employment, he has done janitorial work, cement work, and replaced

brakes on vehicles.  At times, Bitton also has been involved in shoplifting and using marijuana and

meth.  According to a 2009 police record, Bitton denied stealing certain items from a grocery store

until he was confronted with the discarded packaging.  Then he admitted taking the items, and said

it was stupid,[19] which showed an awareness of right and wrong.

One of Bitton's sister testified, however, that Bitton "is very slow.  He does not interpret

things.  He does not have the understanding of just daily routines"[20]  He cannot track his mail and

finances, nor retain what he reads.[21]  He also cannot calendar events or remember when appointments

are.[22]  Nor has Bitton ever lived alone.[23]

---

[17]  First Hearing Tr., 87:7–8; 87:19–20; 88:17–21.

[18]  David M. Ranks, Neuropsychological Evaluation, 2 (June 2007) (Def. Ex. B - first hearing) (hereinafter "Ranks Report I").  Ranks amended his report on January 8, 2008, to state "[t]he Rey Osterreith Complex Figure Test (PAR) was planned as part of this assessment but due to the extensive time the assessment took and the significant additional time needed to administer that test, it was not given."  *Id.* at 2; First Hearing Tr.,7:16–25.  No other modifications were made.

[19]  Sunset City Police Dep't Incident Report, 3 (Feb. 20, 2009) (Docket No. 236, Exhibit).

[20]  First Hearing Tr., 175:19–20.

[21]  *Id.* at 175:19–176:1; 177:21–25.

[22]  *Id.* at 178:9–18; Second Hearing Tr., 72:1–5 (Docket No. 233).

[23]  First Hearing Tr., 176:6–10.

Another sister testified that Bitton's ability to "get around on his own" is limited.[24]  He typically rides a bike, and he has to take structured routes.[25]  When he has to go to appointments, one of his sisters usually finds out when the appointment is and then takes him to it.[26]  While he has been employed in the past, his jobs have been more in the nature of a sheltered workshop.  For example, while he did work on brakes, he did not change them alone.  A family friend hired him to do the work and supervised him as he did it.[27]  While living at home with his mother, another family member tracked his activities almost daily to make sure he stayed on task with his assigned duties.[28]  In June or July 2009, his mother was placed in a nursing home due to Alzheimers.[29]  Bitton currently is living in a half-way house.

**Ranks' Report - 2006**

On behalf of the government, a Special Assistant U.S. Attorney referred Bitton to David M. Ranks ("Ranks") "for evaluation of possible mental retardation" in 2006.[30]  Ranks did not administer any of the standard protocols for testing competency.[31]  On the neuropsychological tests that Ranks did administer, Bitton "showed levels of impairment on tests of judgment, reasoning, logical

---

[24]  Second Hearing Tr., 123:9–13 (Docket No. 233).

[25]  *Id.* at 123:14–18.

[26]  *Id.* at 122:19–123:8.

[27]  *See* First Hearing Tr., 180:6–12; Second Hearing Tr., 70:17–23 (Docket No. 233).

[28]  First Hearing Tr., 178:24–179:15; Second Hearing Tr., 126:10–127:2 (Docket No. 233).

[29]  Second Hearing Tr., 124:6–12 (Docket No. 233).

[30]  Ranks Report I, at 1.

[31]  First Hearing Tr., 10:6–11.

analysis, current problem-solving, and on multitasking and flexibly shifting his thinking that would be most consistent with dementia."[32] Ranks discounted these results, however, because they were inconsistent with Bitton's ability to drive and his functioning on other tests.[33] In short, Ranks concluded that Bitton was malingering and that certain test results were invalid.

The Minnesota Multiphasic Personality Inventory Two ("MMPI-2") requires a "9th grade reading level on *some of the items*."[34] Bitton completed the test, but presented an idealized version of himself, according to Ranks.[35] The test also showed that Bitton was anxious and withdrawn.[36] Ranks reports that the Rorschach test disclosed that Bitton "lacks the normal adult resources to maintain conscious direction of his behavior, so that he is very fragile and vulnerable to disruption from even small increments of stress."[37] "Minor demands can lead to confusion, poor judgment, inappropriate behavior, or poor impulse control. He is likely to function adequately only in situations with routine, simple predictable demands."[38] Additionally, Bitton tends to ignore complex matters and focus on "manageable parts or minor or unusual details."[39] "Some of his efforts to integrate and synthesize information are simplistic and characteristic of children rather than adults;

_____

[32] Ranks Report I, at 4.

[33] *Id.*

[34] *Id.* at 5 (emphasis added).

[35] *Id.*

[36] *Id.*

[37] *Id.* at 6.

[38] *Id.*

[39] *Id.*

this can lead to faulty conclusions."[40]   Nevertheless, he has no "impairment in his reasoning processes."[41]  Ranks did not appear to dispute these test results based on malingering because Bitton "could not control his presentation" on the Rorschach test.[42]

Ranks also administered Green's Word Memory Test; Green's Medical Symptom Validity Test; and Green's Non-Verbal Medical Symptom Validity Test, which are used to test "effort" or malingering.  Ranks compared Bitton's scores against different population groups, including adults with early dementia, advanced dementia, mental retardation, and individuals who were asked to fake impairment.  According to Ranks, the tests disclosed that Bitton was malingering.

During the first competency hearing, Ranks testified about these test results through use of several demonstrative exhibits.  On Green's Word Memory Test ("WMT"), Ranks testified:

> The people with dementia do much better on the easy tests and have a much harder time on the harder tests, whereas [Bitton] does the very best on the hardest test and does the worst on the easiest test.[43]

This testimony is misleading.  For the percentage of items answered correctly on the WMT, Bitton scored between about 57 and 68 percent on the easiest memory tests.[44]  Yet, on the hardest memory

---

[40]  *Id.*

[41]  *Id.*

[42]  *Id.* at 9.

[43]  First Hearing Tr., 136:13–16.

[44]  Green's Word Memory Test, at 1 (Aug. 11, 2006) (Plaintiff's Ex. 2 - first hearing).  The abbreviation "IR" stands for immediate recall, and "DR" stands for delayed recall.  Ranks testified these are the easiest memory tests.  The abbreviation "FR" stands for free recall and "LDFR" stands for long-delayed free recall.  Ranks testified these are the hardest memory tests.

tests, Bitton only scored between 20 and 25 percent.[45] The objective data do not support that Bitton does his very best on the hard tests and his worst on the easy tests.

What Ranks may have meant to state is that Bitton scored lower on easy memory tests than individuals with dementia and mental retardation. For example, on immediate recall, Bitton only had 68 percent of the items correct, whereas those with dementia has 71 percent correct, and individuals with mental retardation had 92 percent correct. In contrast, on the harder tests, Bitton scored above those with dementia. (No test results were provided for those with mental retardation.) For example, Bitton had 20 percent correct on the free recall test, whereas those with dementia had only 10 percent correct.

Ranks then performed a statistical analysis of the data, which shows the "goodness of fit" between Bitton and the different population groups.[46] Ranks testified that Bitton scored 21.5 standard deviations ("sds") below those with mental retardation on immediate recall, 8.5 sds away on delayed recall, 5.3 sds away on consistency, for an average discrepancy of 13.82 sds.[47] The results reported on the WMT line graph are inconsistent with the statistical analysis and testimony. On immediate recall, Bitton scored about 68 percent and those with mental retardation scored about 92 percent. On delayed recall, Bitton scored about 57 percent and those with mental retardation scored about 96 percent. On consistency, Bitton scored about 56 percent and those with mental retardation scored about 91 percent. Thus, according to the line graph, the least disparity occurred

---

[45] *Id.*

[46] First Hearing Tr., 136:17–20; 137:1–2.

[47] *Id.* at 137:2–10.

on immediate recall, the second least disparity occurred on consistency, and the greatest disparity occurred on delayed recall.  None of these results correspond with the standard deviations reported by Ranks on the statistical analysis, which calls into question the other reported statistical data.

Further problems are shown in the column headings on the statistical analysis sheet.  One heading states that the early dementia patients are in hospital care, but another heading for the advanced dementia patients includes no such notation.[48]  Yet, on the corresponding legend for the WMT line graph, the exhibit identifies the advanced dementia patients as those who are in the hospital.[49]  Thus, Ranks may either have the color coding incorrect on the line graph, or the headings incorrect on the statistical graph.  What is clear, however, is that Bitton's test scores more closely match those with dementia than those who were faking impairment.[50]

Bitton's performance on Green's Non-Verbal Medical Symptom Validity Test also is inconsistent with Ranks' conclusion.  Bitton obtained perfect scores on five of the seven subtests, whereas those who faked impairment scored at least 30 percentage points below him on the same subtests.[51]  On the other two subtests, Bitton scored 70 percent on delayed recognition-variations and 30 percent on free recall.[52]  Bitton's performance on the test showed a "Pass," which typically

---

[48]  Green's Word Memory Test, at 2 (Plaintiff's Ex. 2 - first hearing).

[49]  *Id.* at 1.

[50]  *See id.*

[51]  Green's Non-Verbal MSVT, at 1 (Plaintiff's Ex. 5 - first hearing).

[52]  *Id.*

indicates good effort.[53]   Ranks nevertheless discounted the results to conclude that Bitton was malingering.   Ranks based his conclusion on the fact that both Bitton and those who were faking impairment scored higher on DRA than DRV, and higher on PA than FR.[54]   DRA and PA are two of the subtests in which Bitton obtained a perfect score; in contrast, those who were faking impairment only scored 70 percent.   This disparity in performance calls into question Ranks conclusion about Bitton faking performance.

Ranks also administered the Wechsler Adult Intelligence Scale ("WAIS") and the Reynolds Intellectual Assessment Scales ("RIAS") test.   The version of the WAIS that Ranks used was produced and normed in 1955.[55]   Although the WAIS had been updated twice,[56] Ranks used the first version "for the discrete purpose of assessing brain damage, neuropsychological function."[57]   He did not use it to test intelligence.[58]   To test intelligence, Ranks used the RIAS.   On the RIAS, Bitton's verbal score was normal, his non-verbal score was low-normal, and his composite score was

---

[53]   *Id.* at 2.

[54]   *Id.* at 1; First Hearing Tr., 144:11–16.   "DRA" refers to delayed recall-archetypes, "DRV" refers to delayed recognition-variations, PA refers to paired associate, and "FR" refers to free recall.

[55]   First Hearing Tr., 13:23–14:1.

[56]   *Id.* at 14:2–4.

[57]   *Id.* at 15:12–13.

[58]   *Id.* at 15:15–17.   Under the psychologist's code of conduct, it is impermissible to base an assessment or decision on an obsolete test, so it was appropriate for Ranks not to use the WAIS to test IQ.   *See id.* at 18:14–24.

normal.[59]  The RIAS test "was normed and released in 2003."[60]  During norming, a sample of 26 adults with mental retardation took the test.[61]  Of those 26 adults, one examinee scored above 100 on two of the tests scales.[62]  This inflated test scores somewhat, and showed that "outliers" can exist among people with the same diagnosis.[63]

**Ranks' Report - 2009**

When Bitton's counsel requested that Bitton be evaluated again due to purported declines in functioning, Ranks retested Bitton on September 16, 2009, and issued a report on September 23, 2009.[64]  Bitton's sister drove him to take the test.[65]  Bitton reported he had not been employed for two years, but he had calluses on his hands.[66]  Bitton's performance again showed he best fit the performance of those with dementia.[67]  Ranks re-administered the RIAS as well, and saw that Bitton's IQ had dropped dramatically.[68]  Nevertheless, Ranks concluded that Bitton was still

---

[59]  Ranks Report I, at 2–3. (Def. Ex. B - first hearing).

[60]  First Hearing Tr., 25:22–24.

[61]  Second Hearing Tr., 178:12–15 (Docket No. 233).

[62]  *Id.* at 178:23.

[63]  *See id.* at 178:22–24.

[64]  *See* David M. Ranks, Neuropsychological Evaluation, 1 (Sept. 23, 2009) (Def. Ex. 1 - second hearing) (hereinafter "Ranks Report II").

[65]  *Id.* at 2.

[66]  *Id.*

[67]  *Id.* at 4.

[68]  *Id.* at 3.

malingering and therefore his test results were invalid.[69]

To support his conclusion about malingering at the second competency hearing, Ranks testified about the callouses on Bitton's hands and apparently assumed that Bitton must be working.[70] He opined that people with mental retardation or dementia are unable to engage in significant physical activity because they fatigue easily; thus Bitton must be malingering about his condition.[71]

Additionally, the government introduced Bitton's test results from 2006 and 2009 on Green's WMT.[72] Rather than using the same line graph from 2006 that had been used during the first competency hearing and simply comparing it to Bitton's 2009 performance, the government submitted a new line graph for 2006. Instead of using the "percent correct" scale, the graph was changed to a less distinguishable "Z-score." Moreover, the population groups for comparison were changed from mentally retarded, early dementia, and advanced dementia to mentally retarded, brain injured, impaired memory, and advanced dementia. No data were provided for those with early dementia. Furthermore, the Z-score spread on the 2006 line graph is in three unit increments,[73] while the Z-score spread on the 2009 line graph is in four unit increments.[74] Thus, the court cannot simply

---

[69] *See* Second Hearing Tr., 37:18–21, 38:5–11 (Docket No. 233).

[70] *See id.* at 41:5–16.

[71] *Id.* at 41:17–42:3. Whether Bitton was employed on the date of re-testing, the court subsequently found him to be in violation of his pretrial release due to lack of employment. *See* Minute Entry (Dec. 23, 2009) (Docket No. 220).

[72] Green's Word Memory Test (Plaintiff's Ex. 2 - second hearing).

[73] *Id.* at 2.

[74] *Id.* at 1.

lay the two line graphs next to each other to compare the differences in Z-scores between 2006 and 2009. Such reporting is less than helpful to the court when determining whether a person's performance has declined over a three year period for purposes of competency.

Despite these problems, one thing is evident from the data. Bitton's performance on the subtests show similar peaks and valleys on both tests despite the three year span in test data. In other words, Bitton performed highest on the same subtests and lowest on the same subtests as before, but with an overall lower performance in 2009. Such consistency weighs against Ranks' conclusion of malingering and that Bitton's test results were invalid.

**Gregory's Reports**

In 2005, Bitton's counsel also referred him for testing, which Vickie R. Gregory ("Gregory") performed. Gregory concluded that Bitton performed well on the CAST*MR,[75] showed a basic understanding of the legal system and its function, and was therefore competent in that respect.[76] She also concluded that Bitton did not fit neatly within the diagnosis of mental retardation or dementia, but nevertheless exhibited brain damage that "impairs his ability to properly assist counsel during attorney-client interviews and lengthy court proceedings due to impairments with vocabulary, verbal reasoning, abstract thought, memory, cognitive flexibility, language and communication."[77] Due to deficits in these areas, Gregory concluded that Bitton lacks an ability to process and

---

[75] The CAST*MR is a multiple choice test that evaluates the competency of those with mental retardation. Gregory Report I, at 13 (Def. Ex. C - first hearing); *United States v. Rodriguez*, No. 2:08cr61, 2009 U.S. Dist. LEXIS 81024, at *2 (E.D. Pa. Sept. 8, 2009).

[76] Gregory Report I, at 13 (Def. Ex. C - first hearing); *see also* First Hearing Tr., 89:18–89:6.

[77] Gregory Report I, at 11, 14 (Def. Ex. C - first hearing); *see also* Second Hearing Tr., 67:20–22 (Docket No. 233) (Gregory testifying she has no doubt that Bitton "has brain damage").

-13-

remember information during a trial.[78]  Accordingly, Gregory believes that Bitton is incompetent on this basis.[79]

In 2005, Gregory administered the WAIS-III.  Consistent with Bitton's IQ test in 1970, Bitton performed worse on the verbal scale and better on the non-verbal scale.[80]  His full scale IQ had dropped, however, from 80 in 1970 to 70 in 2005.  Bitton performed poorly on the Wechsler Memory Scale-III, ranking only in the 1st percentile on auditory immediate and auditory delayed memory tests.[81]  He likewise performed poorly on other memory tests.[82]  One memory test revealed that Bitton could not recall the fundamental elements of a passage that Gregory read to him, even when he was immediately asked to recall the details.[83]

On tests evaluating Bitton's "higher order cognitive functions," such as planning, flexibility, and reasoning, Bitton's scores varied.  His visual reasoning ranked between the 9th percentile and the 27th percentile on different tests.[84]  On cognitive flexibility, however, his performance ranked below the 1st percentile.[85]  Cognitive flexibility includes an ability to listen to different speakers and track

---

[78]  First Hearing Tr., 91:12–92:5.

[79]  *Id.* at 98:9–14.

[80]  Gregory Report II, at 2 (Def. Ex. 4 - second hearing).

[81]  Gregory Report I, at 9–10 (Def. Ex. C - first hearing).

[82]  *Id.* at 10.

[83]  *Id.* at 9–10; Gregory Report II, at 2–3 (Def. Ex. 4 - second hearing).

[84]  Gregory Report I, at 10 (Def. Ex. C - first hearing).

[85]  *Id.*

a conversation or proceeding.[86]  Deficits in cognitive flexibility make it difficult to shift between one speaker and another in a court proceeding.[87]

During interviews with Bitton, Gregory found that Bitton had difficulty communicating.  He could not remember historical facts and had trouble responding to simple questions.[88]  Additionally, Bitton has a slow processing speed, which further complicates his ability to understand court proceedings.[89]  Finally, Gregory also tested whether Bitton was malingering, but used different tests than Ranks.  No malingering was found, and Gregory concluded that Bitton's current functioning is consistent with his performance prior to this case.[90]  In other words, nothing in Bitton's history shows that he has "ever functioned in an average range."[91]

In 2009, Gregory performed additional testing.  She administered the WAIS-IV, which was the latest version of the test at that time.[92]  Bitton's full scale IQ had dropped down to 60.[93]  Bitton also showed a decline in his Auditory Immediate Memory scores from "65 (1st percentile) to 55 (0.1st

---

[86]  *See* First Hearing Tr., 92:1–4.

[87]  Gregory Report I, at 11 (Def. Ex. C - first hearing).

[88]  Second Hearing Tr., 67:2–9 (Docket No. 233).

[89]  *Id.* at 80:15–16.  This fact is supported by Ranks' statement in his first report that he was unable to complete all the planned tests because of the extensive time it took to administer the tests to Bitton.  Ranks Report I, at 2 (Def. Ex. B - first hearing).

[90]  Gregory Report I, at 5–6 (Def. Ex. C - first hearing); Second Hearing Tr., 85:10–86:15 (Docket No. 233).

[91]  Second Hearing Tr., 66:17–19 (Docket No. 233).

[92]  *See id.* at 105:22–23.

[93]  Gregory Report II, at 2 (Def. Ex. 4 - second hearing).

percentile)."[94]  During an interview, Gregory noted that Bitton's understanding of court proceedings also had declined in the intervening years.[95]  Additionally, "his responses were shorter and required considerable follow-up questioning by [Gregory]."[96]

## ANALYSIS

I.    **BURDEN OF PROOF**

The court must find by a preponderance of the evidence whether a defendant is competent to stand trial.[97]  Federal statute does not define who bears "the burden of proving whether a defendant is competent to stand trial," and the circuits differ on this issue.[98]  Generally, "[t]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent."[99]  In this case, Bitton performs normally in certain areas but poorly in others.  Accordingly, allocation of the burden is necessary. In the Tenth Circuit, the issue has not been clearly decided, but there is a strong indication that the

---

[94]  *Id.*

[95]  *Id.* at 3.

[96]  *Id.* at 4.

[97]  *United States v. Whittington*, 586 F.3d 613, 617 (8th Cir. 2009) (citing 18 U.S.C. § 4241(d)).

[98]  *Id.* (citation omitted).

[99]  *United States v. Wayt*, 24 Fed. Appx. 880, 883 (10th Cir. 2001) (quoting *Medina v. California*, 505 U.S. 437, 441 (1992)).

burden falls on the defendant.[100]  Moreover, "[i]n dicta, the United States Supreme Court has indicated that the burden under Section 4241 lies with the defendant."[101]  On this basis, the court concludes that Bitton must prove by a preponderance of the evidence that he is incompetent to stand trial.

## II.  STANDARD FOR COMPETENCY

### A.  Two-Prong Test

"The Constitution forbids the trial of a defendant who lacks mental competency."[102]  "The test for competency to stand trial asks whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."[103]  This standard "is reflected in 18 U.S.C. § 4241," which states a person is incompetent if:

> the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the

---

[100]  *Compare United States v. Sanchez-Gonzalez*, 109 Fed. Appx. 287, 290 (10th Cir. 2004) (indicating the defendant bears the burden of proving incompetency); *United States v. Smith*, 521 F.2d 374, 377 (10th Cir. 1975) (same), *with Wayt*, 24 Fed. Appx. 880, 883 (10th Cir. 2001) (noting that the federal statute does not allocate the burden and finding that the court "need not resolve the question" at that time of who bears the burden); *United States v. Mitchell*, No. 2:08cr125, 2010 U.S. Dist. LEXIS 18065, at *8–12 (D. Utah Mar. 1, 2010) (concluding that who bears the burden of proof is not settled in the Tenth Circuit).

[101]  *Mitchell*, 2010 U.S. Dist. LEXIS 18065, at *8–9 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) (stating "Congress has directed that *the accused* in a federal prosecution must prove incompetence by a preponderance of the evidence") (emphasis added)).

[102]  *United States v. deShazar*, 554 F.3d 1281, 1285 (10th Cir. 2009) (citing *Indiana v. Edwards*, 128 S. Ct. 2379, 2383 (2008)).

[103]  *Id.* at 1286 (quotations and citations omitted).

-17-

>     nature and consequences of the proceedings against him or to assist
>     properly in his defense.[104]

Although Bitton's rational and factual understanding of the proceedings may be low, he does not

challenge competency on that basis. Instead, he challenges competency on the basis that he lacks

sufficient present ability to consult with his counsel and properly assist in his defense.

###    B.    Ability to Assist Counsel

When determining competency, "the question is often a difficult one in which a wide range

of manifestations and subtle nuances are implicated."[105] Such is the case here. As stated above,

competency determinations involve a two-prong test. Alone, it is not sufficient to show that Bitton

understands the nature of the proceedings or even that he can "recount the factual events leading to

his arrest."[106] "A defendant is not merely responsible for dispensing factual information to his

attorney; he is also responsible for making many decisions throughout the course of a criminal

matter."[107] The United States Supreme Court recognized some of the "important decisions" a

defendant must make, such as, "[i]n consultation with his attorney . . . [how] to put on a defense[,]

whether to raise one or more affirmative defenses," and whether to confront an accuser on cross-

examination.[108] To make an informed decision on these issues, one must be able to understand

---

[104] *United States v. Rodriguez*, No. 2:08cr61, 2009 U.S. Dist. LEXIS 81024, at *27 (E.D. Pa. Sept. 8, 2009) (quoting 18 U.S.C. § 4241(d)).

[105] *Id.* at *28 (quotations and citation omitted).

[106] *Id.* (citation omitted).

[107] *Id.* at *32 (citing *Godinez v. Moran*, 509 U.S. 389, 398 (1993)).

[108] *Godinez*, 509 U.S. at 398.

information, retain it, and then apply it in context during a proceeding.

i.   *Rodriguez* Decision

In *United States v. Rodriguez*, the court faced many of the same factual issues that have been presented in this case.  In the past, Rodriguez had "worked as a mechanic, a cleaner, . . . a landscaper," and "a house painter."[109]  He was easily led by others and "slow since he was born."[110]  His condition was "compounded by several head injuries throughout his lifetime," including one where he lost consciousness and was hospitalized for one day.[111]  When trying to find a location, Rodriguez was easily lost and had trouble remembering when appointments were scheduled.[112]  He also had difficulty "grasp[ing] abstract concepts" and then applying them to a situation.[113]

One expert determined that Rodriguez had "a full-scale IQ score of 56" and that he performed poorly on the CAST*MR test.[114]  He further determined that Rodriguez's "short-term memory" was "moderately impaired" and his long-term memory was variable.'[115]  Another expert concluded that Rodriguez had a "full-scale IQ score of 69" and that he "play[ed] dumb" at times.[116]  He further concluded that while Rodriguez suffered from cognitive deficits and memory impairment, he was

---

[109]   *Rodriguez*, 2009 U.S. Dist. LEXIS 81024, at *10.

[110]   *Id.* at *11–12 (quotations and citation omitted).

[111]   *Id.* at *12.

[112]   *Id.* at *14.

[113]   *Id.* at *14–15.

[114]   *Id.* at *2.

[115]   *Id.*

[116]   *Id.* at *4–5.

-19-

still "marginally competent."[117]

Ultimately, the court concluded that Rodriguez was not malingering.[118] It further concluded that Rodriguez had trouble processing events as they occurred, and therefore could not respond to events as they transpired in court.[119] Additionally, the court found that Rodriguez's memory posed a problem because it could "make him forget the concept before the time for decisionmaking."[120] These facts precluded him from properly assisting in his defense. Thus, the court found him incompetent and noted it was not a close question.[121]

      ii.    <u>Bitton's Deficitis</u>

Here, the court heard testimony from two experts. While many test results were similar, the experts reached opposite conclusions because Ranks concluded that Bitton was malingering. "It is well-settled that expert opinion as to competency is not binding on the trier of fact if there is reason to discount it."[122] As stated above, a number of discrepancies exist in Ranks' testimony and conclusions. Additionally, the court feels that Ranks acted more as an advocate rather than a neutral expert. Thus, the court rejects Ranks' conclusion about malingering and that Bitton's test results are invalid.

---

[117] *Id.* at *5.

[118] *Id.* at *19.

[119] *Id.* at *29–30.

[120] *Id.* at *34 (citation omitted).

[121] *Id.* at *36, 38.

[122] *United States v. Izquierdo*, 448 F.3d 1269, 1279 (11th Cir. 2006) (citation omitted).

While both experts concur that Bitton's profile does not fit neatly within a diagnosis of mental retardation or dementia, there is little doubt that Bitton does suffer cognitive deficits. Gregory testified that a combination of factors in Bitton's life could have led to his current deficits. He had a lower IQ or learning disability in grade school, followed by a head injury, drug use, and a family history of dementia.[123] Because a variety of factors may be contributing to his current functioning, it is not surprising that he does not fit neatly into one diagnostic category.

Similar to Rodriguez, though, Bitton does have a low IQ, significant memory problems, and a slow processing speed. His inability to recall verbal material and lack of flexibility in thought precludes him from tracking a chain of events typical in a trial where a witness testifies, an attorney makes an objection, a judge rules, and then an attorney resumes questioning.[124] His memory deficits also preclude him from recalling a witness statement and discussing it with his attorney during a break.[125] This limits his ability to assist in his own defense.

The impact of Bitton's cognitive deficits on a court proceeding was shown during the first competency hearing. During that hearing, information came in about Bitton putting brakes on vehicles. During a break, Bitton did not attempt to explain the job he had. Gregory, however, tracked him down and questioned him about it.[126] Only then was it learned that Bitton had merely assisted in putting the brakes on vehicles. Bitton either did not realize the relevance of the testimony

---

[123]   Second Hearing Tr., 68:17–25 (Docket No. 233).

[124]   *Id.* at 81:8–20.

[125]   *Id.* at 81:21–82:2.

[126]   *Id.* at 76:8–24.

or remember it to assist in his defense by raising the issue with his counsel. Moreover, at the conclusion of the hearing, Bitton thought he had been found guilty, even though it was just a competency hearing.[127] Since that time, Bitton's cognitive functioning has continued to decline according to the 2009 test results. This raises a serious question as to whether Bitton can now assist in his own defense.

Neither expert disputes that Bitton's ability to assimilate information is more characteristic of a child than an adult.[128] Nor do they dispute that he is "fragile and vulnerable to disruption from even small increments of stress."[129] Even "[m]inor demands can lead to confusion [and] poor judgment."[130] Thus, he is most apt to "function adequately *only* in situations with routine, simple predictable demands."[131] A trial is not a routine, simple demand that creates little stress or requires little effort to assimilate information. Rather, it is a setting that likely will exacerbate Bitton's functional deficits. Moreover, the court has had the opportunity to observe Bitton during several hearings. Bitton's demeanor does not support that he is fully engaged in the proceedings. He has little communication with his counsel, has little eye contact with anyone, and frequently does not observe those who are testifying.

Based on the totality of circumstances, the court concludes that Bitton does have deficits that

---

[127] First Hearing Tr., 186:7–14.

[128] *See e.g.*, Ranks Report I, at 6 (Def. Ex. B - first hearing).

[129] *Id.* at 6.

[130] *Id.*

[131] *Id.* (emphasis added).

are serious enough to impair his ability to assist in his own defense.  Accordingly, the court finds him incompetent to stand trial.  Pursuant to 18 U.S.C. § 4241(d), the court "commit[s] the defendant to the custody of the Attorney General" for treatment and a determination whether competency can be restored.  Such commitment shall not exceed four months, upon which time the court will determine whether the trial may proceed or whether Bitton is subject to other provisions of the law.

DATED this 13th day of May, 2010.

BY THE COURT:

Clark Waddoups
United States District Judge